Argued and submitted September 11, 2007, court's decision in *Williams v. Philip Morris Inc.*, 340 Or 35, 127 P3d 1165 (2006), adhered to; decision of Court of Appeals affirmed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings January 31, 2008

Mayola WILLIAMS,
Personal Representative of the Estate of
Jesse D. Williams, Deceased,
*Respondent on Review,*

*v.*

PHILIP MORRIS INCORPORATED,
nka Philip Morris USA Inc.,
*Petitioner on Review,*

*and*

RJ REYNOLDS TOBACCO COMPANY,
Fred Meyer, Inc.,
and Philip Morris Companies, Inc.,
*Defendants.*

(CC 9705-03957; CA A106791; SC S051805)

176 P3d 1255

William F. Gary, of Harrang Long Gary Rudnick P.C., Eugene, argued the cause and filed the brief for petitioner on review. With him on the brief were Sharon A. Rudnick, and James E. Mountain, Jr.

James S. Coon, of Swanson, Thomas & Coon, Portland, argued the cause and filed the responses for respondent on review. With him on the responses were Raymond F. Thomas, Portland, Robert S. Peck, Center for Constitutional Litigation PC, Washington D.C., William A. Gaylord, of Gaylord Eyerman Bradley PC, Portland, Charles S. Tauman, Portland, Kathryn H. Clarke, Portland, and Maureen Leonard, Portland.

Steven C. Berman, of Stoll Stoll Berne Lokting & Shlachter P.C., Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association. With him on the brief was David F. Sugerman, Portland.

Janet A. Metcalf, Assistant Attorney General, Salem, filed the brief for *amicus curiae* State of Oregon. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Gillette, Durham, Walters, and Linder, Justices.**

** Balmer and Kistler, JJ., did not participate in the consideration or decision of this case.

GILLETTE, J.

## GILLETTE, J.

█ This matter is before us on remand from the United States Supreme Court. Previously, this court held (among other things) that certain federal constitutional limitations constraining punitive damage awards did not require a trial court to instruct a jury that it was not to use an award of punitive damages to punish a defendant for harms to persons who were not parties to the litigation. *Williams v. Philip Morris Inc.*, 340 Or 35, 51-54, 127 P3d 1165 (2006). On certiorari, the United States Supreme Court vacated that opinion and remanded. *Philip Morris USA v. Williams*, 549 US 346, 127 S Ct 1057, 1065, 166 L Ed 2d 940 (2007). The Court concluded that the Due Process Clause of the Fourteenth Amendment prohibits the state from using punitive damages to punish for harms to nonparties, and that states must prevent punitive damages from being misused in that way. 549 US at ____, ____, 127 S Ct at 1063, 1065. On remand, we are called upon to reconsider and reassess our earlier holding, which arose in the context of the trial court's refusal to give a particular proposed jury instruction that defendant had requested. Having reconsidered and reassessed the issue, we now conclude that the proposed jury instruction at issue here also was flawed for other reasons that we did not identify in our former opinion. We therefore reaffirm this court's prior conclusion that the trial court did not err in refusing to give the instruction. We otherwise reaffirm our prior opinion in all respects.

█ Before we turn to the facts and procedural posture of this particular case, we first summarize the legal context in which it arose. The issues in this case revolve around federal constitutional limitations on punitive damage awards. Those constitutional limitations derive from the Due Process Clause of the Fourteenth Amendment. *See Philip Morris*, 549 US at ____, 127 S Ct at 1060; *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 416, 123 S Ct 1513, 155 L Ed 2d 585 (2003); *BMW of North America, Inc. v. Gore*, 517 US 559, 562, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (all illustrating proposition). In those cases, the Supreme Court has held that states legitimately may use punitive damages to punish and to deter wrongdoing by defendants in tort cases.

*E.g.*, *Philip Morris*, 549 US at ____ , 127 S Ct at 1062. However, the Court also has held that the amount of punitive damages that a jury awards cannot be arbitrary; the jury's discretion must be limited. Otherwise, defendants will not have adequate notice of potential sanctions, the punishments may be arbitrary, and large punitive damage awards may force one state's policy choices onto other states. *Id.* For those reasons, the United States Constitution requires both procedural and substantive limits on punitive damage awards. *Id.*

We turn to the facts of this case. The plaintiff, Mayola Williams, is the widow of Jesse Williams, a smoker who died of lung cancer. Plaintiff, as personal representative of Jesse Williams's estate, sued defendant Philip Morris Inc., asserting that Philip Morris's fraud and negligence caused Jesse Williams's death.

The parties do not dispute this court's prior overview of the evidence offered at trial, which was presented in the light most favorable to plaintiff. *See Williams*, 340 Or at 38-43 (describing facts of case). Briefly, the evidence permitted the jury to conclude that Philip Morris and other tobacco companies had known of the carcinogenic dangers of smoking since at least the 1950s. *Id.* at 41. Nevertheless, Philip Morris, operating in conjunction with the rest of the tobacco industry, carried out an extensive publicity campaign, from the 1950s into the 1990s, to convince the public that doubts remained about whether smoking actually was dangerous to one's health. *Id.* at 40. No legitimate controversy existed about whether smoking was harmful to health, although Philip Morris and the rest of the tobacco industry strove to persuade the public otherwise. *Id.* at 41-42 (issuing press releases, cultivating opinion leaders, using advertising power to seek favorable treatment from the media, etc.). Philip Morris and the rest of the tobacco industry also fostered the sham impression that they were themselves vigorously investigating the health effects of smoking when, in actuality, their research institution avoided doing research on that question. *Id.* at 40-41.

The jury further could have concluded that this program of disinformation succeeded in tricking Jesse Williams, who smoked from the early 1950s until he died in 1997. He

was highly addicted to nicotine, eventually smoking three packs of cigarettes—primarily Philip Morris's Marlboro brand—a day. *Id.* at 38. Williams resisted his family's efforts to convince him to quit smoking, because he believed media representations that the dangers of smoking were overstated or nonexistent. *See id.* at 39 (presented with article about dangers of smoking, Williams had found "published assertions that cigarette smoking was not dangerous"); *id.* at 42 (Williams rejected arguments to quit, because "he had learned from watching television that smoking did not cause lung cancer"). When Williams was diagnosed with lung cancer, however, he asserted that the "cigarette people" had betrayed him by "lying" to him. *Id.* at 39 (internal quotation marks and citation omitted). Williams was dead within six months after the cancer was discovered. *Id.*

Near the end of trial, the parties offered proposed jury instructions. One instruction submitted by Philip Morris was its proposed jury instruction No. 34, dealing with punitive damages. Among other things, that instruction provided:

> "The size of any punishment should bear a reasonable relationship to the harm caused to Jesse Williams by the defendant's punishable misconduct. Although you may consider the extent of harm suffered by others in determining what that reasonable relationship is, you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims and award punitive damages for those harms, as such other juries see fit."

(The complete text of the instruction, which was three-and-a-half pages long, is reprinted as an Appendix to this opinion.)

The trial court analyzed the proposed jury instructions line-by-line with the parties, during which time Philip Morris argued that the consider-but-don't-punish part of proposed jury instruction No. 34 was needed to ensure that this plaintiff did not receive punitive damages that should be awarded (if they were to be awarded at all) to other plaintiffs. After the trial court had reviewed Philip Morris's proposed jury instruction No. 34 together with plaintiff's proposed jury instruction on punitive damages—the transcript of that part of the trial court's analysis is 50 pages long—the trial court

declined to give proposed jury instruction No. 34 as proffered.[1]

The jury returned a verdict for plaintiff. The jury's unadjusted award was $821,485.50 in compensatory damages and $79.5 million in punitive damages. The trial court, among other things, reduced the punitive damage award to $32 million. *Williams*, 340 Or at 44.

Plaintiff and Philip Morris both appealed. The Court of Appeals reversed on plaintiff's appeal, concluding that the trial court should not have reduced the punitive damages award. *Williams v. Philip Morris Inc.*, 182 Or App 44, 72, 48 P3d 824, *adh'd to on recons*, 183 Or App 192, 51 P3d 670 (2002). The Court of Appeals affirmed on Philip Morris's cross-appeal, concluding that the trial court did not err in refusing to give Philip Morris's proposed jury instruction No. 34. 182 Or App at 63-64. This court denied review. *Williams v. Philip Morris Inc.*, 335 Or 142, 61 P3d 938 (2002).

The United States Supreme Court then granted certiorari, vacated the judgment of the Court of Appeals, and remanded the case to the Court of Appeals for further consideration in light of the Supreme Court's opinion in *Campbell*. *Philip Morris USA Inc. v. Williams*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003). After an extended analysis on remand, the Court of Appeals again reached the same conclusions that it had reached in its earlier opinion. *Williams v. Philip Morris, Inc.*, 193 Or App 527, 530, 92 P3d 126 (2004). Specifically, the court concluded that the $79.5 million punitive damage award did not violate due process. *Id.* at 563. The court also rejected Philip Morris's argument that the trial court erred in refusing to give proposed jury instruction No. 34. *Id.* at 555-57.

This court then allowed defendant's petition for review, and affirmed the decision of the Court of Appeals. *Williams*, 340 Or at 38. This court concluded, also after an extensive analysis, that the $79.5 million punitive damage

---

[1] That is, the trial court did not give proposed jury instruction No. 34 in the form in which Philip Morris proffered it. The trial court did, however, incorporate some concepts from Philip Morris's proposed jury instruction No. 34 into its final instructions to the jury.

award comported with federal due process. *Id.* at 54-64. As pertinent to the present proceeding, this court also rejected Philip Morris's argument that the trial court should have given proposed jury instruction No. 34. Philip Morris had argued that *Campbell* prohibited courts from " 'adjudicat[ing] the merits of other parties' hypothetical claims against a defendant,' " because of the " 'possibility of multiple punitive damage awards for the same conduct[.]' " *Id.* at 52 (quoting *Campbell*, 538 US at 423). This court concluded, however, that those quotations from *Campbell* were taken out of context. "The [full] quote referred only to *dissimilar* acts and dissimilar claims; the Court intended to prohibit a punitive damage award from becoming a referendum on a corporate defendant's general behavior as a citizen." *Id.* at 52 (emphasis in original). But, this court stated, "evidence of *similar* conduct against other parties may be relevant to a punitive damage award." *Id.* at 53 (emphasis in original). Because proposed jury instruction No. 34 therefore incorrectly stated federal requirements of due process of law (at least as this court understood it), this court concluded that the trial court did not err in refusing to give the instruction. *Id.* at 53-54.[2]

On certiorari, the United States Supreme Court reached a different conclusion. *Philip Morris USA*, 549 US at ____, 127 S Ct at 1057. The terms of the Court's decision are important to understanding the issues presented to this court. We therefore review that opinion in some detail.

After reviewing the procedural history of the case, the Court summarized the limits that due process imposes on punitive damages awards. *Id.* at 1060-63. Although the United States Constitution requires both procedural and substantive limits on punitive damage awards, *id.* at 1062, in this case the Court only addressed the procedural limits. *Id.* at 1063. As the Court explained, "the Constitution's Due Process Clause forbids a State to use a punitive damages

---

[2] Plaintiff also had argued, in the alternative, that the refusal to give proposed instruction No. 34 was not error, because that instruction misstated other points of law. Given this court's holding that the instruction was erroneous with respect to federal due process law, however, this court did not need to address those alternative arguments. Now, in light of the remand from the United States Supreme Court, we must consider those alternative reasons for affirmance.

award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Id.* The Court identified three reasons for that conclusion: First, a defendant cannot effectively defend against claims of injuries to nonparties. *Id.* Second, permitting a punitive damages award to punish for harm to nonparties "would add a near standardless dimension to the punitive damages equation," with speculation about the nonparties magnifying the risk of arbitrary treatment. *Id.* And, third, the Court found that no authority existed to permit using punitive damages to punish for harm to nonparties. *Id.*

That said, the Court also went on to acknowledge that harm to nonparties (to the extent that it exists) may play a role in the punitive damages calculus in the sense that it is relevant to showing the degree of reprehensibility of a defendant's conduct. *Id.* at 1063-64. The Court distinguished, however, between legitimate use of evidence of such harm to establish reprehensibility and illegitimate use of that evidence to punish defendant for harm it caused to nonparties. As the Court explained:

> "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible * * *. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties."

*Id.* at 1064. The Court repeated the same point later in its opinion:

> "We have explained why we believe the Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation. At the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility."

127 S Ct at 1065 (citation omitted).

All in all, the Court concluded, the risks of unfairness inherent in punitive damage awards mean that state

courts must "provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." *Id.* at 1064. The Court noted that that distinction raised practical difficulties for reviewing courts, difficulties that should be met by appropriate procedures:

> "How can we know whether a jury, in taking account of harm caused others under the rubric of reprehensibility, also seeks to *punish* the defendant for having caused injury to others? Our answer is that state courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring. In particular, we believe that where the risk of that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, upon request, must protect against that risk. Although the States have some flexibility to determine what *kind* of procedures they will implement, federal constitutional law obligates them to provide *some* form of protection in appropriate cases."

*Id.* at 1065 (emphases in original).

Having explained the general principles of law, the Court then applied those principles to this case. "The instruction that Philip Morris said the trial court should have given distinguishes between using harm to others as part of the 'reasonable relationship' equation (which it would allow) and using it directly as a basis for punishment." *Id.* at 1064. The Court reviewed this court's opinion in *Williams*, 340 Or at 35, and concluded that that opinion permitted direct punishment for harm to others, without limiting the use of such harm to determine reprehensibility. 127 S Ct at 1064-65. For that reason, the Court vacated this court's opinion and remanded for further proceedings. The Court specifically explained its conclusion, and the nature of the remand, as follows:

> "As the preceding discussion makes clear, we believe that the Oregon Supreme Court *applied the wrong constitutional standard* when considering Philip Morris' appeal. We remand this case so that the Oregon Supreme Court can *apply the standard we have set forth.* Because the application of this standard *may* lead to the need for a new trial, or

a change in the level of the punitive damages award, we shall not consider whether the award is constitutionally 'grossly excessive.' "

*Id.* at 1065 (emphases added).

Under the Supreme Court's remand, then, it is our task to apply the constitutional standard set by the Supreme Court in our consideration of the sole issue raised by Philip Morris, *viz.*, whether the trial court erred in refusing to give proposed jury instruction No. 34.[3] As we shall explain, however, there is a preliminary, independent state law standard that we must consider, before we address the constitutional standard that the United States Supreme Court has articulated.

A state court decision like the decision of the trial judge in this case to refuse to give proposed jury instruction No. 34 may be affirmed, without reaching the federal question, if there is an independent and adequate state ground for doing so. *See, e.g., Osborne v. Ohio*, 495 US 103, 123, 110 S Ct 1691, 109 L Ed 2d 98 (1990) (Ohio Supreme Court, applying state law, had held that defendant had waived due process challenge by failing to object to jury instructions at trial: "We have no difficulty agreeing with the State that [defendant's] counsel's failure to urge that the court instruct the jury on scienter constitutes an independent and adequate state-law ground preventing us from reaching [defendant's] due process contention on that point."). We believe that this is such a case, *i.e.*, one resting on an independent and adequate state ground for affirming the trial judge's ruling.[4]

Under Oregon law, there are two different types of error respecting jury instructions: (1) error in the failure to give a proposed jury instruction, and (2) error in the jury instructions that actually were given. *See Bennett v. Farmers*

---

[3] Defendant did not preserve any issue as to the instructions that the trial court did give. *See Williams*, 340 Or at 54 (so explaining).

[4] Put differently, we understand the Court's use of the phrase, "upon request," *Philip Morris USA*, 127 S Ct at 1065, to be an acknowledgment of the authority of states to place reasonable procedural requirements on any request for instructions, including requests like the one at issue here. Our treatment of this topic in the pages that follow is based on that understanding, and on the belief that Oregon's rule concerning the correctness of requested instructions is a reasonable allocation of responsibility to parties to a jury trial.

*Ins. Co.*, 332 Or 138, 152-53, 26 P3d 785 (2001) (so indicating). As noted, Philip Morris failed to preserve for our review any claim that the jury instructions actually given were erroneous. *See Williams*, 340 Or at 54 (unpreserved in Court of Appeals). This case, therefore, involves only the *failure to give* a proposed jury instruction.

■     In Oregon, there is a well-understood standard governing claims of error respecting a trial judge's refusal to give a proffered instruction: An appellate court will not reverse a trial court's refusal to give a proposed jury instruction, unless the proposed instruction was "clear and correct in all respects, both in form and in substance, and * * * altogether free from error." *Beglau v. Albertus*, 272 Or 170, 179, 536 P2d 1251 (1975) (citations omitted); *see also Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998) ("there is no error [in refusing to give a proposed instruction] if the requested instruction is not correct in all respects"); *Owings v. Rosé*, 262 Or 247, 258, 497 P2d 1183 (1972) ("The trial court is not obliged to give an incorrect instruction, or to give the correct portions of one which includes errors."). The effect of that standard is to require that a party to litigation take responsibility for the jury instructions that a trial court either gives or refuses to give. That means that, in the case of the refusal to give an instruction—and we repeat that that is all that is at stake here—the party seeking a particular instruction must be correct respecting the rule of law stated in the instruction. In this case, the United States Supreme Court has opined that there is a risk that a jury will be confused about how to take into account harm that the defendant may have caused to others. A trial court must, "upon request," protect against that risk. But, as with any other request for an instruction, the question that we first must address is whether the rest of Philip Morris's requested instruction correctly stated Oregon law. It is not enough, for example, to offer a proposed instruction that is correct in part and erroneous in part, leaving the trial court to solve the problem for itself. *Beglau*, 272 Or at 179. We also note, in passing, that asking the court to give a multiple-page instruction—essentially placing all the party's eggs in one instructional basket—involves a significant danger that the proffered instruction will be erroneous in some aspects. We

turn to an examination of proposed instruction No. 34 in light of the standard just discussed.

Proposed instruction No. 34 addressed a range of issues relating to punitive damages, and plaintiff contends that it was erroneous in a number of ways that are unrelated to the issues addressed by the United States Supreme Court. Among other things, plaintiff contends that proposed instruction No. 34 would have instructed the jury erroneously that (1) the Oregon statutory factors that the jury must find in order to justify a punitive damage award were discretionary, when they are mandatory; and (2) one factor to be considered in awarding punitive damages was Philip Morris's "motiv[ation]" to make "illicit profits." As we will explain, we agree with plaintiff on both points.

■ First, however, we must consider an initial objection, because Philip Morris contends that plaintiff cannot now raise those alternative reasons to affirm the trial court's judgment. The trial court reviewed the proposed jury instructions line-by-line, but Philip Morris claims that plaintiff failed to make the additional objections to the trial court on which it now relies. For that reason, Philip Morris asserts, the trial court cannot be affirmed as having been "right for the wrong reasons." We reject that argument, because the plaintiff need not have made any objection at all in order for the trial court to have been legally justified in rejecting the instruction, if it did not correctly state the law. The correctness of the instruction, in light of the factual record that both parties had a full opportunity to develop, was purely a legal issue, and the burden was on defendant to offer a legally sufficient instruction. If defendant did not do so, then there was a legally correct justification for the trial court's decision to refuse the proffered instruction. Under such circumstances, the trial court's ruling should be sustained.[5]

■ Finally, before we examine what proposed instruction No. 34 actually would have done, we examine what it

---

[5] We also reject defendant's assertion that any further or different effort by it respecting the instruction would have been "futile." The record throughout belies that idea: The trial judge was solicitous of, and at pains to consider, the views of both parties respecting instructions.

appears that defendant intended the instruction to accomplish. Oregon law provides that, in product liability actions (such as the present case), punitive damages should be awarded (if at all) based on seven criteria. ORS 30.925(2), which sets out that requirement, provides:

"Punitive damages, if any, shall be determined and awarded based upon the following criteria:

"(a)  The likelihood at the time that serious harm would arise from the defendant's misconduct;

"(b)  The degree of the defendant's awareness of that likelihood;

"(c)  The profitability of the defendant's misconduct;

"(d)  The duration of the misconduct and any concealment of it;

"(e)  The attitude and conduct of the defendant upon discovery of the misconduct;

"(f)  The financial condition of the defendant; and

"(g)  The total deterrent effect of other punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's * * *."[6]

Proposed jury instruction No. 34 restated most of the foregoing factors—often drastically. It provided:

"(2)  The size of the punishment may appropriately reflect the degree of reprehensibility of the defendant's conduct—that is, how far the defendant has departed from accepted societal norms of conduct. Factors that you may find to bear upon the degree of reprehensibility include:

"(a)  The likelihood at the time that serious harm would arise from the defendant's misconduct, beyond the harms generally understood to inhere in cigarette smoking;

"(b)  The degree of the defendant['s awareness of that likelihood;

"(c)  The degree to which the defendant was motivated by a desire to obtain illicit profits from its misconduct;

---

[6] The parties agreed at trial that the jury did not need to be instructed about subsection (g), because no evidence had been presented on that point.

"(d)  The duration of the misconduct and any concealment of it;

"(3)  In determining how much punishment is necessary to achieve the goal of appropriate deterrence, you may consider the extent to which the obligation to pay compensatory damages will suffice to cause defendant and others to refrain from similar misconduct in the future.

"(4)  Finally, you may also consider the defendant's financial condition as part of the process of arriving at an appropriate punishment. However, you may not punish the defendant simply because it is large. Rather, the paramount consideration remains the degree of reprehensibility of any misconduct and the extent of any harm caused by such misconduct."

We turn to plaintiff's critique of that proposed instruction. Plaintiff first argues that proposed jury instruction No. 34 incorrectly indicates that the statutory factors are discretionary and nonexclusive "[f]actors that you *may* find to bear * * * *include*" (emphasis added)—while ORS 30.925(2) actually makes those factors mandatory and exclusive— "*shall* be determined and awarded based upon the following criteria." (Emphasis added.) Philip Morris offers no argument against plaintiff's proposed reading of the statute.

We agree with plaintiff that proposed jury instruction No. 34 is defective in the way that plaintiff argues. ORS 30.925(2) uses the word "shall," which generally indicates that something is mandatory. *See, e.g., Preble v. Dept. of Rev.*, 331 Or 320, 324, 14 P3d 613 (2000) (so noting). The legislature's instruction that any punitive damage award "shall be determined and awarded based upon the following criteria" thus limited the scope of the jury's authority to the list that followed. Altering that list in a jury instruction (as defendant proposed to do) would therefore fly in the face of the statute. Defendant might have a constitutional right to a further instruction of the kind suggested by the United States Supreme Court in *Williams*, but nothing in that right negated the trial court's duty to follow ORS 30.925(2) in all other respects. To have given the instruction in the form proffered by defendant thus would have been error under Oregon law.

■ Plaintiff also maintains that proposed jury instruction No. 34 misstates one of the statutory factors in ORS 30.925(2). While the proposed jury instruction would have permitted the jury to consider "[t]he degree to which the defendant was motivated by a desire to obtain illicit profits from its misconduct," ORS 30.925(2)(c) actually directs the jury to consider "[t]he profitability of the defendant's misconduct." That is, proposed jury instruction No. 34 focuses on *motive* or *intent*, while the statute instead focuses on *outcome*. Again, to have given the instruction in the form proffered by defendant would have been error under Oregon law.

On remand, Philip Morris makes no argument that proposed jury instruction No. 34 accurately states the law in that respect. In the prior briefing in this case, however, Philip Morris had addressed that issue in part. As to the words "illicit profits," Philip Morris had contended that those words were necessary to "prevent[ ] the jury from relying on [Philip Morris's] 'profits'—without regard to whether they were derived from lawful or unlawful conduct—as an indirect way of punishing lawful cigarette sales." In support, Philip Morris cited *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 441-42, 121 S Ct 1678, 149 L Ed 2d 674 (2001), in which the Court stated that "it would be unrealistic to assume that all of [defendant's] sales of [a competing product] would have been attributable to its misconduct in using a photograph of [plaintiff's product] in its initial advertising materials." *Id.* at 442.

Again, we agree with plaintiff that Philip Morris's justification fails, and proposed jury instruction No. 34 misstated the law. While the statutory factor requires an examination of the profitability of the misconduct—an objective fact—proposed jury instruction No. 34 instead focuses on Philip Morris's subjective state of mind regarding profit—*i.e.*, whether Philip Morris was "motivated by a desire" to profit from misconduct. And, while ORS 30.925(2)(c) directs the jury to consider all "profitability of the misconduct," the proposed jury instruction permits the jury to consider only *"illicit* profits from its misconduct" (emphasis added), thus implicitly directing the jury to try to subdivide the profits from misconduct into legal and illegal parts—a circular inquiry, at best.

We see no merit to Philip Morris's argument that the jury instruction needed to refer to "illicit profits" to keep the jury from considering *lawful* profits, because that simply misreads the statutory factor. ORS 30.925(2)(c) does not allow the jury to consider profitability generally—it instead limits the jury's inquiry to a consideration of "the profitability *of the misconduct*." (Emphasis added.) But, once the profitability of the misconduct is identified, it makes no difference whether it was otherwise licit (not against law) or illicit (against law). Either way, it was relevant to the jury's inquiry.

We think that it follows from the foregoing analysis that, even assuming that proposed jury instruction No. 34 clearly and correctly articulated the standard required by due process, it contained other parts that did not state the law correctly. Accordingly, the trial court did not err in refusing to give it. Our previous conclusion to that effect is reaffirmed. And, because our ruling respecting the trial judge's refusal to give proposed jury instruction No. 34 was correct, it follows that the remaining aspects of the judgment against defendant should be reaffirmed. That latter point is true, not only because reconsidering the remaining aspects of the judgment would lie outside the scope of the Supreme Court's remand, but also because defendant has not advanced any separate arguments for doing otherwise. We therefore reaffirm our previous decision in this case in all particulars.

The court's decision in *Williams v. Philip Morris Inc.*, 340 Or 35, 127 P3d 1165 (2006), is adhered to. The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

APPENDIX

The text of Philip Morris's proposed jury instruction No. 34 reads as follows (emphases in original):

"DEFENDANT'S REQUESTED
JURY INSTRUCTION NO. 34

"PUNITIVE DAMAGES - PRODUCTS LIABILITY

"I will now instruct you on punitive damages. If you find that Marlboro cigarettes are a defective product or that the defendant is guilty of negligence or fraud, you must consider whether to award punitive damages.

"Punitive damages may be imposed only if the plaintiff has satisfied you by clear and convincing evidence that the defendant, in engaging in the conduct that caused Jesse Williams' death, has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.

"Clear and convincing evidence is evidence of such weight and quality that, even when considered in light of any conflicting evidence, leaves you with a firm conviction that the truth of the matter in question is highly probable.

"You have the discretion to award, or not to award, punitive damages. In the exercise of that discretion, you may consider whether the imposition of punitive damages is necessary to punish and deter similar misconduct by defendant and others in the future.

"In considering punitive damages, I remind you that the sale of cigarettes has in itself been at all times a lawful activity in this State. You are not to punish the defendant on account of the propensity of cigarettes to cause illness and death for some of those who smoke them, or the defendant's knowledge of that propensity, except to the extent that the risks from smoking were not a matter of general public knowledge but were known to and unlawfully misrepresented by the defendant.

"In determining whether the defendant's conduct is such as to subject it to punitive damages, you must not allow

your decision to be influenced by the defendant's financial condition, corporate status, or place of business.

"If you determine that some amount of punitive damages should be imposed on the defendant, it will then be your task to set an amount that is appropriate. This should be such amount as you believe is necessary to achieve the objectives of deterrence and punishment. While there is no set formula to be applied in reaching an appropriate amount, I will now advise you of some of the factors that you may wish to consider in this connection.

"(1) The size of any punishment should bear a reasonable relationship to the harm caused to Jesse Williams by the defendant's punishable misconduct. Although you may consider the extent of harm suffered by others in determining what that reasonable relationship is, you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims and award punitive damages for those harms, as such other juries see fit.

### "[ALTERNATIVE]

"**(1) You are not to punish the defendant for the impact of its conduct on individuals in other states.**

"(2) The size of the punishment may appropriately reflect the degree of reprehensibility of the defendant's conduct—that is, how far the defendant has departed from accepted societal norms of conduct. Factors that you may find to bear upon the degree of reprehensibility include:

"(a) The likelihood at the time that serious harm would arise from the defendant's misconduct, beyond the harms generally understood to inhere in cigarette smoking;

"(b) The degree of the defendant[']s awareness of that likelihood;

"(c) The degree to which the defendant was motivated by a desire to obtain illicit profits from its misconduct;

> "(d) The duration of the misconduct and any concealment of it;

"(3) In determining how much punishment is necessary to achieve the goal of appropriate deterrence, you may consider the extent to which the obligation to pay compensatory damages will suffice to cause defendant and others to refrain from similar misconduct in the future.

"(4) Finally, you may also consider the defendant's financial condition as part of the process of arriving at an appropriate punishment. However, you may not punish the defendant simply because it is large. Rather, the paramount consideration remains the degree of reprehensibility of any misconduct and the extent of any harm caused by such misconduct."